Filed 12/10/20  P. v. Garcia CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>REX GARCIA,<br><br>Defendant and Appellant. | F077721<br><br>(Super. Ct. No. F15905754)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Moran Law Firm and Amanda K. Moran for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Rex Garcia, a retired law enforcement officer, was convicted by jury trial of one count of continuously sexually abusing his step-granddaughter.  On appeal, he raises a litany of claims including challenges to the sufficiency of the evidence to prove the crime, and that his counsel was constitutionally ineffective for failing to object to an

expert witness's testimony. That witness, David Love, was designated an expert "in the field of Child Abuse Accommodation Syndrome and the Neurophysiology of Trauma."

Love's testimony was admissible to *generally* describe common misconceptions relating to child sex abuse victim credibility. In so doing, his testimony involved several aspects closely resembling the trial's facts. For example, he testified about factual scenarios involving grandfathers abusing grandchildren and abusers who have "a title of respect" in the community.

Love also recited many statistics regarding child sex abuse victims. One such statistic was that only "one percent" of child sexual abuse allegations are false. At no point did Garcia's counsel object to Love's testimony.

As we shall explain, these concerns, among others, lead us to conclude the expert testimony in this case ran afoul of well-established limits on accommodation syndrome evidence. We further conclude Garcia was prejudiced by his counsel's failure to object to Love's testimony. Because the evidence was otherwise sufficient to prove the conviction, the judgment is reversed due to ineffective assistance of counsel. The People may retry the case upon remand.[1]

## BACKGROUND

**Charges**

The Fresno County District Attorney charged Garcia with one count of continuous sexual abuse of a child. (Pen. Code,[2] § 288.5.)

---

[1] Garcia's remaining claims each seek a new trial. These claims are rendered moot by our disposition.

[2] Undesignated statutory references are to the Penal Code.

**Trial Evidence**

Garcia married his wife in 2000. About nine years later, his wife's son was released from prison and permanently moved into their home. The son had a daughter, J., who was born in 2002. J. is Garcia's step-granddaughter.

J. moved into Garcia's home "about six months" after her father's release from prison. She was seven years old. Before then, her mother had been neither a constant nor positive influence in her life.

Raising J. became a group effort. Everyone, including Garcia, helped with homework and discipline. Garcia and his wife became J.'s primary providers because her father was extremely busy pursuing his own education.

When J. was about nine years old, she moved into her own bedroom. Shortly after her 13th birthday, she disclosed to her father that Garcia had been touching her inappropriately. Her father believed her but was unsure how to proceed. He feared the police would not believe J. because Garcia, a retired law enforcement officer with approximately 30 years of experience, was well connected with local law enforcement. Instead of immediately reporting the crime, he purchased a video camera hoping to gather additional evidence.

The camera did in fact record three videos. The videos depicted Garcia entering J.'s bedroom while she slept at night but did not capture any misconduct. Garcia discovered the camera on the third night, prompting J. and her father to report the abuse the following morning. Garcia was arrested the next day.

J.'s report to law enforcement and her trial testimony disclosed the following: She was educated about sex abuse at a "fairly young" age and was taught the importance of disclosing abuse when it occurs. Nonetheless, she did not immediately speak out against Garcia because she "wasn't sure that it was happening" until one morning when she woke up with her pajama bottoms missing. She explained that Garcia had awakened her in the middle of the night by touching the hair near her vagina. She went back to sleep, unsure

3.

if it was a dream. After waking up in the morning and noticing her pajama bottoms had been removed, she disclosed the incident to her father.

This was not the lone incident. The first abusive incident J. could recall was when she was about eight or nine years old. During that incident, Garcia touched her chest and asked if "he could do this when [she's] older." The abuse resumed when she turned 12 and continued "once or twice" a week in the same manner as the incident that caused her to disclose the abuse, i.e., Garcia touching the hair near her vagina in the middle of the night while she slept.

J.'s father testified that during this time period, J. was depressed and struggled with school. He "got her into counseling" the day after disclosing the abuse. He added that, in the months preceding her disclosure, she began avoiding interaction with Garcia. According to him, J. never explained why she avoided Garcia. For example, if he asked her to ask Garcia to take her to the movies, she would simply respond, "[N]o, it's okay."

Garcia testified and denied ever inappropriately touching J.. He acknowledged he entered J.'s bedroom on a nightly basis. He explained, due to his prior law enforcement career and the Polly Klaas[3] case, he routinely checked every lock and window to secure the house each night. About a week before he was arrested, he talked to J.'s father about when he planned to move out of the house with J..

Garcia's wife testified and corroborated Garcia's testimony about checking locks and securing the house, including in J.'s bedroom. She also corroborated Garcia discussed moving out with her son "just before [Garcia] was arrested …." At some point after Garcia's arrest, she overhead J. saying, "[N]ow it's mine and your house dad …." Both J. and her father denied that statement.

---

[3] In 1993, twelve-year-old Polly Klaas was abducted and murdered by a man who entered her home through a window. (*People v. Davis* (2009) 46 Cal.4th 539, 552-558.)

4.

Several of Garcia's friends, neighbors, and relatives testified on his behalf. These witnesses were not concerned by J.'s allegations and testified Garcia was both trustworthy with children and honest.

As mentioned above, Love testified as an expert for the prosecution. His testimony, detailed below, discussed issues relating to the credibility of child sex abuse victims.

**Verdict and Sentence**

Garcia was convicted as charged. He was sentenced to serve six years in state prison.

**DISCUSSION**

To properly resolve this appeal, we must address two claims. First, is the evidence sufficient to prove continuous sexual abuse of a child? Second, was defense counsel constitutionally ineffective by failing to object to Love's expert testimony? After carefully reviewing the record, we reject the first claim but find merit in the second.

**I. The Evidence Is Sufficient**

Garcia challenges the evidentiary sufficiency of nearly every element of the crime. Additionally, he claims J.'s testimony was "inherently improbable or physically impossible." These claims are meritless.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence." (*Ibid.*)

" 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt

and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

Four elements are necessary to prove continuous sexual abuse of a child. One, the defendant either lived with or had recurring access to the victim. Two, the defendant committed three or more acts of substantial sexual conduct or lewd or lascivious conduct with the victim. Three, the first and last act occurred at least three months apart in time. Four, the victim was less than 14 years old. (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1158; *People v. Rodriguez* (2002) 28 Cal.4th 543, 550; § 288.5, subd. (a).) Lewd or lascivious conduct means any touching committed with a sexual intent. (*People v. Martinez* (1995) 11 Cal.4th 434, 444-445.) The evidence at trial readily proves these elements.

The first element is not in dispute. The evidence clearly establishes J. was 13 years old when she disclosed the abuse. The abuse first occurred several years earlier when she was about seven years old. It also occurred on at least three separate occasions. Indeed, the evidence established it occurred at least once per week for more than one year. And the jury could infer a sexual purpose from the following facts: J. testified Garcia repeatedly touched the hair near her vagina, on at least one occasion he removed her clothing, and he once asked her if he could touch her chest when she was "older." Put simply, there could simply be no other purpose on this record.

Finally, nothing in the record indicates J.'s testimony is either inherently improbable or physically impossible.[4] The evidence sufficiently proved the crime and we reject Garcia's contrary contention.

## II. Defense Counsel Was Ineffective

Garcia argues Love's accommodation syndrome testimony involved the improper admission of statistical evidence, improper advocacy to the jury, and, rather than rehabilitating J.'s credibility, it ultimately had the impermissible effect of proving the crime. In conclusion, he claims his "[c]ounsel … had a duty to object to Love's narrative testimony …." The People respond the argument is forfeited because there was no objection and, alternatively, the testimony was properly admitted.

Garcia's point is well taken. After carefully reviewing the record, we conclude the expert testimony failed to adhere to long-standing and well-established limitations on accommodation syndrome evidence. Defense counsel's failure to object at any point constitutes ineffective assistance of counsel because the excessive evidence was highly prejudicial and suggestive of guilt.

### A. Additional Background

As mentioned, Love testified for the prosecution and was qualified as an expert on "Child Abuse Accommodation Syndrome and the Neurophysiology of Trauma." He was part of the original group that published a "paper" on "what is now known as Child Abuse Accommodation Syndrome." He testified the group initially met because they were "concerned … that people don't always want to believe [child sex victims] because they don't present like people expect them to." "[A]s these cases were starting to go into the court system [they] were having some difficulty with Child Protective Services, with

---

[4] To support this contention, Garcia repeatedly relies on witness declarations attached to a new trial motion filed after conviction. The motion is not a part of the trial record and has no bearing on his claim the evidence the jury considered was insufficient.

District Attorneys, and actually in trial sometimes, getting people to really comprehend sort of the behaviors, the emotions, the patterns of molested kids."

The prosecutor inquired into the paper's conclusions. Love answered by first stating it is "a pretty good assumption" that "kids whose parents get them into therapy, they agree to participate in therapy, whether they have been in the court system or not, … were sexually molested kids." After further prompting, he concluded "there were basically five categories of behaviors that we thought were relevant that could help us train others to understand sexually molested kids." The five categories are "secrecy," "helplessness," "entrapment and accommodation," "delayed, conflicted, and/or unconvincing disclosure," and "retraction."

Love first described secrecy. Secrecy permits an abuser to continue sexually molesting a victim. It requires access to the child and the ability to convince the victim "to keep this secret; and [the abuser has] to in the long run believe this is never going to be disclosed."

Before moving on to the next category, the prosecutor asked about "experience with children who may have been educated on what sexual abuse was but they still don't understand that something is wrong …." Love replied that in fact occurs, especially if the abuser is actively involved in the victim's life.

The prosecutor followed up with a specific example where the "perpetrator [is] a grandfather that has been in the life of the child for … the child's entire life …." Love stated that children are taught to respect their elders who consequently "have innate power" to "manipulate or use in this inappropriate way to make the secret work." He then answered a question about the role "a perpetrator's position in the community or having a title of respect might play" by explaining victims might "come[] to the conclusion … they ain't going to believe what I have to say." In other words, victims might believe speaking out against an abuser is futile because the abuser is an important, popular, or powerful person.

8.

After confirming "description of the secrecy component" was complete, the prosecutor started to ask, "With regard to helplessness --." Love interrupted the question and stated that "empirical research" has "found that … 94 percent of children who are sexually molested in a very large study had a preexisting relationship with the offender." He went on to explain that abuse in the home is the most common and, because it "should be a safe place," "it's pretty overwhelming," leaving victims unable to "deal with [abuse]."

The next question inquired into any connection between a child victim's "stability in life" and helplessness. Love answered that instability early in life can leave a child developmentally "handicapped. We find these kids having more emotional problems, more mental health issues, struggling more in school academically because they miss key developmental stages in things in life."

Love then explained entrapment or accommodation. Essentially, victims accommodate abuse to survive. They do not have "in their sort of repertoire of possible strategies … the flight or fight one available for them. So they just kind of go back in that." "They are accommodating just to try and get by." He provided an example involving a grandfather. In the example, the victim said she did not want to go to Disneyland with her grandfather but did not disclose the abuse.

The prosecutor next inquired into how "the fact that a person is a provider to [a] child maybe for basic needs like food and shelter come[s] into play at all with … entrapment or accommodation?" Love replied, "I mean, kids aren't stupid. They know … that so and so is important because where we live or because what we do."

Love was subsequently asked to describe "delay, conflicted or unconvincing disclosure …." His answer occupies nearly eight full pages in the record. It began with a statistic: "74 percent of children who had been molested had not told a single person a year after they were molested. … So we wanted to say delay is more common than not." He continued, "[W]e wanted to say because a child waits please do not disregard them

when they come forward and give them equal credence as if they walked in the house after it happened today at school." And "42 percent of children had some significant level of amnesia; failure to be able to remember key components of what happened to them during the trauma process." Then, after interposing an anecdote, Love stated, "[T]he disclosure comes out in strange times and strange places and strange things. So when kids finally tell their story sometimes it's fragmented. Sometimes it's all not together. Sometimes they can't remember all the pieces of it." He then explained, "The child gets interviewed usually by someone from Child Protective Services or law enforcement when a recording is made. Then if anybody feels like there is something here that's valid, they get interviewed again, hopefully, at a forensic interviewing center." If multiple "interview[s] aren't all identical, that's pretty common." The answer concludes with Love testifying, "I think that for us we want to say that please don't disregard the testimony because they didn't come forward right away. Please understand the children are still sometimes conflicted. And when they are sitting here they are really conflicted. I give credit to a lot of kids to be able to sit here in this scenario."

The prosecutor immediately followed up with, "[H]ow would a child being asleep and waking up to the molest affect these behaviors …?" Love answered, "[K]ids will have a hard time separating reality from … a dream, from what's really going on. So you'll have this part of transitional problem to even sorting out what the heck this is all about."

The next question asked if these behaviors continue after disclosure. Love responded in the affirmative and added, "75 percent of my molested kids end up with clinical depression or post-traumatic stress disorder."

The prosecutor followed up by seeking another statistic: "[W]hat percentage of children you work with … even recognize they are traumatized?" Love answered, "[O]ne percent." With specific references to problems at school, the subsequent inquiry was about how commonly victims "act[] out." Love replied that victims act out because

10.

"[t]hey are coping and also can't cope with it." He then described a "project" involving 1200 "kids" per year. According to him, these "kids … are acting out, getting in trouble, don't do well on their grades, don't show up at school, bully people." He concluded, "[T]hey aren't bad kids. They are kids who get angry. They are kids who act out because something really bad has happened to them. … I can tell with confidence this is traumatized children exhibiting to us their trauma."

The prosecutor then asked, "And would you like to talk about retraction?" Love explained his group began researching why "children will retract some or all of the initial disclosure along the line." His explanation continued, "[W]e wanted to say there are truly molested kids, 15 percent, who will retract some or all of their accusations, even though they were truly molested, 'cuz of them, the dynamics of their life, the pressure placed on them, those kind of things." Without further prompting, Love testified the "National Center on Child Abuse and Neglect … went through 320,000 cases … and found that one percent were false reports. So are there false reports? Truly there are. NCCAN found one percent. But false is kind of not a good word. In our business of legalese of the State of California in child abuse, CPS can go out and find an unsubstantiated case. You don't have enough information to do something. Didn't say it didn't happen." The expert concluded the answer to this question by stating, "We wanted people to understand that we have tons of cases of kids who are probably truly molested, it's just not enough to put together to make it work, even though we see them in therapy."

The prosecutor then prompted Love to define retraction. He replied retraction is a complete denial after an initial disclosure or report. He also explained minimization, which is a mechanism victims utilize to appease people after disclosure and alleviate its ramifications.

Love testified the reason minimizing and retraction occur is due, in part, to changing family dynamics. He explained, "Families line up on both sides of the accused

11.

and the victim. That's tough. That's tough for us as adults to work through. … And imagine how dramatically confusing and difficult it is for a child."

On cross-examination, defense counsel inquired into whether Love's previous therapy practice involved "confirmed victims" as opposed to alleged victims. He responded,

> "They are folks who they or their family members assume that they were truly molested. They are symptomatic of some problems that are causing their life to be in some kind of turmoil or difficulty and felt therapy would be valuable for them. Not all had been convicted in the courts.

> "An interesting piece of that is high piece of our funding to allow us to do this work is from the California Victims of Crime program. And we have to file a claim with the state that says we believe this child, for instance, was molested because the child said this, the parent said this, or if they have been to court or if we have a CPS report or a police report. I have a lot of police reports that never went to court. And then they will pay us for all of the therapy for that child. And they will set aside $20,000 in and [sic] a fund for that until they are 18 for future needs if we, in their evaluation, believes [sic] this is a victim of a crime."

He also acknowledged accommodation syndrome is "not a diagnosis." Instead, "[i]t's a clinical description of a group of behaviors that are consistent with sexually molested children."

Defense counsel later asked if "the best use for" accommodation syndrome "is in how to deal with a child .…" Love testified that was one of two major reasons. "[T]he other major reason is is [sic] that they [sic] are a lot of things like the delay and like, um, not remembering things clearly that we felt worked against children who were truly molested being believed. So the other piece was please because of these things, the five issues that I talked about in detail, don't disregard the child just because they delay. Don't disregard them just because their memory of these things is somewhat jumbled or

confused or through interviews it kind of morphs and changes a little bit. All we wanted to say, please listen carefully. Don't prejudge. And maybe use a little of this knowledge to better work through what you've heard to come to both an accurate and appropriate decision."

At the close of evidence, the court instructed the jury with CALCRIM No. 1193. The instruction informed the jury "testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [J.'s] conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of her testimony."

The jury was also instructed with CALCRIM No. 332. This instruction stated a "witness was allowed to testify as an expert and to give an opinion. You must consider the opinion but you are not required to accept that it is true or correct. … In evaluating the believability of an expert witness follow the instructions about the believability of witnesses generally."

In closing arguments, each party referenced Love's testimony. The prosecutor first told the jury,

> "[Y]ou are tasked with deciding [whose] testimony to believe. As you do that I'm asking you to have a running playback in your mind of David Love's testimony. David Love, who knows nothing about this case … was able to give you a more accurate picture of what happened in this case than the defendant's closest friends and family."

The prosecutor again asked the jury to keep a "running playback of Mr. David Love, while you are considering all the evidence …."

Defense counsel reminded the jury that accommodation syndrome is "not a diagnostic tool." Counsel quoted CALCRIM No. 1193 and stated accommodation

13.

syndrome "is not evidence that [Garcia] committed any of the crimes charged against him."

In rebuttal, the prosecutor urged the jury to "keep in mind everything that Mr. Love said. What Mr. Love said about the research and the science of what he was talking to you guys about, the syndrome that he was talking to you guys about … they started this research and put it into a research paper, because people who had been victims of sexual molestation didn't present the way that most people would expect them to present…. He was saying that not all victims of molest will present the same way. And sometimes their, um, behaviors or their response may be inconsistent with what we would think of people who have been victims of molest. And that's all I'm asking you to do is consider that."

Finally, the prosecutor argued, "[A]ccording to David Love, who has done research in this field, [J.] doesn't even consider herself a victim. When I asked Mr. Love what percentage of children do you see who acknowledge that they've been victimized, he said one percent. And [J.'s] responses from the witness stand clearly showed that. ... She didn't mention that she'd been the victim of sexual molest … because she doesn't see herself as a victim."

**B. Improper Expert Testimony**

Expert testimony explaining abuse accommodation syndrome in child sex abuse cases " 'is admissible to rehabilitate [a child victim's] credibility when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting – is inconsistent with his or her testimony claiming molestation.' [Citation.] ' "Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." ' " (*People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*).)

Accommodation syndrome evidence " 'is not admissible to prove that the complaining witness has in fact been sexually abused.' [Citation.] 'The expert is not allowed to give an opinion on whether a witness is telling the truth ….' " (*Julian, supra,* 34 Cal.App.5th at p. 885.) "The expert … may not give ' "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' " (*Id.* at pp. 885-886.) Such testimony is inappropriate because jurors "may not [be] sensitized … to the dangers of drawing predictive conclusions. The expert may be aware that although victims of child [sex] abuse generally exhibit a particular type of behavior, that behavior is also found in significant numbers of children who have not been molested. The jury may not be similarly cognizant." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393 (*Bowker*).)

Advocacy on behalf of victims is beyond the scope of abuse accommodation syndrome evidence. (*Bowker, supra,* 203 Cal.App.3d at pp. 393-394 ["permissible limits" of expert testimony "far exceeded" where "transcript … was replete with comments designed to elicit sympathy for child [sex] abuse victims and solicitations that children should be believed"]; *Julian, supra,* 34 Cal.App.5th at p. 886 [reiterating impropriety of an expert advocating child sex abuse victims " 'should be believed' " or " 'abused children give inconsistent accounts and are credible nonetheless' "].) "Because the line between impermissible use of expert testimony to prove the child was abused, and permissible use of such testimony … is by no means a bright one, the better practice is to limit the expert's testimony to observations concerning the behavior of abused children as a class and to avoid testimony which recites either the facts of the case at trial or obviously similar facts." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1383-1384 (*Gilbert*).)

Finally, juries "must evaluate" the evidence "without statistical evidence placing a thumb on the scale for guilt." (*People v. Wilson* (2019) 33 Cal.App.5th 559, 571

15.

(*Wilson*).) "Where expert opinions on the statistical probability of guilt are admitted, the jury may be 'distracted' from its 'requisite function of weighing the evidence on the issue of guilt,' and may rely instead on this 'irrelevant' evidence." (*Julian, supra,* 34 Cal.App.5th at p. 886, quoting *People v. Collins* (1968) 68 Cal.2d 319, 327.)

Love's testimony in this case ran afoul of these guidelines. His testimony included multiple irrelevant and highly prejudicial statistics. Several questions and answers improperly mirrored various facts in the case. And his testimony included advocacy. In total, his testimony created an impermissible "predictive index" within which the jury could "pigeonhole the facts … and conclude abuse had occurred." (*Bowker, supra,* 203 Cal.App.3d at p. 395.) We discuss each impropriety in turn.

Chief among the concerns is the statistical evidence. Love testified 74 percent of victims do not disclose abuse for at least one year after it occurs, 75 percent of victims are diagnosed with clinical depression or PTSD, 94 percent of victims have a preexisting relationship with the abuser, and only one percent of victims recognize their own traumatic experience. Each statistic directly reflected the evidence in this case: J. did not disclose abuse for more than one year, she dealt with depression, she had a preexisting relationship with Garcia, and, arguably as discussed below, did not recognize her trauma.

The most troubling statistic, however, was Love's testimony only "one percent" of 320,000 reviewed cases "were false reports." And if that were not powerful enough, he then immediately suggested the percentage of false reports was even lower than one percent by claiming, "[F]alse is … not a good word." Rather, he equated false reports to cases with proof insufficient to take *legal* action. He summed up this statistic by opining there are "tons of cases of kids who are probably truly molested, it's just not enough to put together to make it work, even though [they are] in therapy." This testimony is irrelevant, inadmissible, and extremely prejudicial because it "suggest[ed] to the jury that there was an overwhelming likelihood [J.'s] testimony was truthful." (*Wilson, supra,* 33 Cal.App.5th at p. 570; accord *Julian, supra,* 34 Cal.App.5th at pp. 885-887.)

16.

Because each statistic coincided with the evidence in this case, the jury could conclude J. was abused simply by applying each statistic to the evidence. Indeed, the prosecutor argued to the jury that J. did not "consider herself a victim" based on her testimony. The prosecutor linked this conclusion to Love's testimony that only one percent of victims recognize their trauma. The argument essentially states that if 99 percent of victims do not recognize their trauma, and if J. does not recognize her trauma, then she is a victim. These improper predictive conclusions were not, however, isolated to statistics.

For example, Love testified it is "a pretty good assumption" a child participating in therapy was in fact "sexually molested." He also testified, "acting out, getting in trouble," and struggling with school is consistent with abuse. These predictive conclusions resemble similar evidence adduced during the trial and add upon the statistics. Abating the risk the jury might draw these unwarranted conclusions is the reason limits are placed on accommodation syndrome evidence.

The " 'scientific' framework into which the jury could pigeonhole the facts of the case" (*Bowker, supra,* 203 Cal.App.3d at p. 395) was exacerbated by questions and answers mirroring several facets of J.'s testimony.[5] These facets included inquiries about a grandfather-abuser, a provider-abuser, an abuser with a "title of respect," a victim with an unstable childhood, a victim struggling in school, a sleeping victim, and whether educating a child about abuse necessarily results in victims promptly reporting abuse. Again, each answer coincided with the actual evidence and continued to expand the predictive framework established by Love's testimony.

---

[5] Love testified he was unaware of the facts at issue in this case. Whether or not expert testimony purposefully or unintentionally mirrors the facts at trial is irrelevant to the risk of prejudice. Moreover, the prosecutor who elicited the testimony was intimately familiar with the facts.

Beyond predictive conclusions, Love's testimony recited anecdotes similar to the trial facts. He testified, without prompt, about a case in which a victim did not want to go to Disneyland with her grandfather. The example was apparently offered to explain how some victims attempt to cope with abusers even though they are unable to actively combat or report the abuse. This anecdote corresponded directly with J.'s father's testimony describing J.'s attempts to avoid interacting with Garcia.

Other portions of Love's testimony were both nonresponsive to the posed question and prejudicial. After initially answering a question about whether his private therapy practice involved "confirmed victims," he testified he personally experienced "lots" of cases involving "police reports that never went to court" but the "California Victims of Crime" program nonetheless paid children $20,000 if "we" believe the victims. Monetary payments to victims have nothing to do with either the question or accommodation syndrome. But it obviously suggests many abusers escape apprehension and prosecution despite truthful victims who receive monetary payments from the state.

Love's nonresponsive testimony spilled over into improper advocacy. When describing delayed or unconvincing disclosures, he testified, "I think that for us we want to say that please don't disregard the testimony because they didn't come forward right away. Please understand the children are still sometimes conflicted. And when they are sitting here they are really conflicted. I give credit to a lot of kids to be able to sit here in this scenario." (See *Bowker, supra,* 203 Cal.App.3d 394 [expert inappropriately expressed "how frightening it" is for a child to testify in court].) When asked about "the best use for" accommodation syndrome, he partly testified, "[P]lease because of these things, the five issues that I talked about in detail, don't disregard the child just because they delay. Don't disregard them just because their memory of these things is somewhat jumbled or confused or through interviews it kind of morphs and changes a little bit. All we wanted to say, please listen carefully. Don't prejudge. And maybe use a little of this

knowledge to better work through what you've heard to come to both an accurate and appropriate decision."

In sum, Love's testimony involved facts "obviously similar" to those at issue. (*Gilbert, supra,* 5 Cal.App.4th at pp. 1383-1384.) He recited irrelevant and prejudicial statistics and anecdotes. And he improperly advocated on behalf of victims. These improprieties resulted in a "predictive index" within which the jury could "pigeonhole the facts … and conclude abuse had occurred." (*Bowker, supra,* 203 Cal.App.3d at p. 395.) Accordingly, we find the testimony crossed the line from a permissible use into an impermissible use of accommodation syndrome evidence.

### C. Ineffective Assistance of Counsel

The Sixth Amendment guarantees the " 'right to the effective assistance of counsel.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 685-686.) " '[T]o establish a claim of ineffective assistance of counsel, [Garcia] bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] ... under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125 (*Bell*).) "[D]eference to counsel's performance is not the same as abdication" and " 'must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 675 (*Centeno*).)

19.

" 'If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*Bell, supra,* 7 Cal.5th at p. 125.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*In re Gay* (2020) 8 Cal.5th 1059, 1086.) "How readily deficient performance undermines confidence in the trial's outcome will in part depend on the strength of the trial evidence on any decisive points. A 'verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.' " (*Id*. at p. 1087.)

Both prongs are met here. Although the record sheds no light on why counsel did not lodge any objections, we conclude there is no possible satisfactory explanation.

As described above, much of Love's testimony was objectionable. At a minimum, counsel should have objected to the testimony that false reports constitute one percent of cases because its import—that 99 percent of allegations are true—is facially prejudicial and irrelevant. It was also nonresponsive to the question regarding "retraction" which was subsequently defined as a victim denying abuse after an initial disclosure. (See Evid. Code, § 766 ["A witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of any party."].) The fact that only one percent of reports are false does not answer the question. Another nonresponsive example is the testimony about $20,000 funds for victims in situations involving "police reports that never went to court."

Other objectionable examples abound. Counsel should have objected to questions reciting "obviously similar facts" to Garcia's case. (See *Gilbert, supra,* 5 Cal.App.4th at pp. 1383-1384.) Undoubtedly, counsel was aware several questions and answers during Love's examination involved facts strikingly similar to those at trial. The legal precedent

underlying these objections is decades old. Consequently, we cannot find a satisfactory explanation for counsel's inaction.

In some circumstances, actively choosing not to object to a solitary improper question or inadmissible answer might well constitute sound trial strategy. But counsel's complete and repeated failure here to object to damaging testimony on different legal grounds falls below an objective standard of reasonableness.

We further conclude counsel's deficient performance prejudiced Garcia. Initially, we note defense counsel, in closing argument, quoted the court's earlier pattern instruction on CALCRIM No. 1193 to correctly remind the jury that Love's "testimony about Child Sexual Abuse Accommodation Syndrome" was not evidence Garcia committed the crimes. There are two reasons counsel's reminder did not alleviate or cure the prejudice. First, after counsel's reminder, the prosecutor in rebuttal again asked the jury to "keep [Love's testimony] in mind" and then immediately applied the statistical evidence directly to the case by arguing J. did not consider herself a victim in accordance with 99 percent of other victims. The rebuttal argument ran counter to and undercut the court's earlier pattern instruction. The court did not thereafter clarify the law. (*Centeno, supra,* 60 Cal.4th at pp. 676-677 [jury instructions do not eliminate prejudice where "prosecutor's argument [is] the last word on the subject"]; *People v. Cowan* (2017) 8 Cal.App.5th 1152, 1155 [same].)

Second, Love was qualified as an expert in both accommodation syndrome *and* "[n]europhysiology of [t]rauma." The instructions did not explain to the jury how to utilize testimony about neurophysiology of trauma. Indeed, the evidence never differentiated between accommodation syndrome and neurophysiology. Were the statistics expert testimony about accommodation syndrome and thus not evidence Garcia committed the crime? Or were they expert testimony founded in the neurophysiology of trauma for which the jury had neither guide nor limit to its evidentiary value? Or were they simply expert testimony reciting statistics without regard to accommodation

21.

syndrome?  Because these questions were not addressed, we cannot conclude the instructions mitigated the risk the jury improperly accepted Love's excessive testimony as evidence Garcia committed the crime.

The potential for prejudice was great.  The evidence for guilt consisted primarily of J.'s largely uncorroborated testimony.[6]  There was no confession, no forensic evidence, and no third-party eyewitness.  The case presented for the jury a classic credibility contest.

The defense contested nearly every allegation and offered a motive for J. to fabricate the allegations.  Garcia testified in his own defense and denied all allegations. He also refuted the video exhibits by sensibly explaining his presence in J.'s bedroom while she slept.  His explanation regarding his presence was corroborated by his wife, who also corroborated J.'s possible motive to lie.  And many witnesses testified to Garcia's character for honesty and trustworthiness with children.

Because the evidence for guilt was equivocal, counsel's failure to object to Love's testimony undermines our confidence in the outcome.  (See, e.g., *Julian, supra,* 34 Cal.App.5th at pp. 888-889 [finding deficient performance prejudicial where "case was a credibility dispute" and "heavily contested … with strong defense evidence"]; *Centeno, supra,* 60 Cal.4th at p. 677 [finding deficient performance prejudicial where "prosecution depended almost entirely on … credibility"]; cf. *Wilson, supra,* 33 Cal.App.5th at p. 572 [deficient performance harmless where evidence included contradictory expert testimony and "other percipient witnesses"].)  Love's testimony that only one percent of child sex abuse allegations are false, along with the other outlined

---

[6] The video evidence at trial is at best inconclusive.  Only one of the three exhibits (Ex. 1) arguably shows any contact between Garcia and J., it is somewhat obscured, and the video only lasted a few seconds.  It is not definitive and could be consistent either with J.'s testimony or Garcia's explanation at trial.  It does not mitigate the prejudice resulting from counsel's failure to object to the significant evidentiary error in this case.

22.

improprieties, placed a heavy "thumb on the scale for guilt." (*Wilson, supra,*
33 Cal.App.5th at p. 571.) Counsel's failure to attempt to balance the scale by objecting denied Garcia his constitutional right to effective counsel.

## DISPOSITION

The judgment is reversed for proceedings consistent with this opinion.[7]

SNAUFFER, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


SMITH, J.

---

[7] Pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), we are required to report our reversal of the judgment for ineffective assistance of counsel to the State Bar of California for investigation of the appropriateness of initiating disciplinary action against trial counsel. We shall do so upon issuance of the remittitur in this case.